UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:06-CR-30 |
| | ) | (Varlan / Guyton) |
| | ) | |
| MARK ANTHONY TINDELL, | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the district court as may be appropriate. This matter came before the Court on July 30, 2007, for an evidentiary hearing on four pending pretrial motions. Defendant Mark Tindell ("Tindell") was present with his attorney, Robert Vogel. Assistant United States Attorney Tracy Stone represented the government.

At the hearing, the Court received testimony and exhibits, and heard arguments of counsel on the issues raised in Tindell's Motion to Suppress Evidence [Doc. 46], Motion to Suppress Statements [Doc. 47], Second Motion in Limine [Doc. 65], and Motion to Dismiss [Doc. 70] . All four motions pertain to the suppression of certain evidence and suppression of incriminating remarks made by Tindell to law enforcement.

The government presented testimony of Knoxville Police Department Officer Brian Headrick ("Headrick") and Knoxville Police Department Investigator Nevin Long ("Long"). Tindell presented the testimony of Melissa King ("King") and the defendant testified. Eight exhibits were

introduced at the hearing, as described herein.

At the close of the evidentiary hearing, the defendant asked the Court for leave to file a post-hearing brief after an opportunity to review the record, which was granted. Given the time estimated for the preparation of a transcript of the hearing, the Court established August 9, 2007, as the deadline for Tindell's post-hearing brief. A transcript was filed with the clerk of the court on August 8, 2007 [Doc. 88]. The defense then requested an extension of time for filing a brief, which was granted [Doc. 90]. On August 20, 2007, the defendant waived the right to file a post-hearing brief and advised the Court that he would rely on his previous pretrial motions and arguments made at the hearing. [Doc. 92]. Accordingly, this Court took the matter under advisement on August 21, 2007. See 18 U.S.C. § 3161(h)(1)(J).

## I: FACTS

### A. Testimony of Brian Headrick of the Knoxville Police Department

#### *Direct Examination*

On January 4, 2006, Headrick was engaged in surveillance of suspected drug activity in a commercial parking lot on Central Street near Springdale Avenue. After seeing what he believed to be a drug transaction, Headrick conducted a traffic stop on one of the cars involved, charging the driver with possession of drug paraphernalia and "some other traffic violations." [Tr. 5]. This person (who remained unnamed) told Headrick that he suffered from an oxycodone addiction and that he bought and traded valuables for the drug. This person identified Mark Tindell as his drug supplier and gave police Tindell's cell phone number and directions to his apartment. [Tr. 6]. Headrick followed-up on this information; he and two other officers went to the apartment believed

to be Tindell's.

Headrick, Long and Officer Hughett ("Hughett") went to the address, which was near the intersection of Sanford Road and Dry Gap Pike. [Tr. 7]. The intersection of Sanford Road and Dry Gap Pike lies within the City of Knoxville, but the apartment was just outside the city limit, though still within Knox County. [Tr. 7]. Headrick described the apartment as between 200 and 300 yards from the intersection and within a mile perimeter of the city limit [Tr. 7]. Headrick identified a map of the location, introduced as Exhibit 1, and testified that he routinely responds to calls for police assistance in the area. [Tr. 8 - 9]. Headrick next identified a photograph, introduced as Exhibit 2, of the view facing the apartment complex from the intersection of Dry Gap and Sanford. [Tr. 12].

Headrick then described his initial contact with Tindell as follows. On foot, Headrick approached the apartment building containing the unit he believed to belong to Tindell, number 3. Headrick was accompanied by Long and Hughett. As the three police walked toward the building, down Sanford, they saw a man, fitting the description given by the informant, walking with a female. [Tr. 13].

The man confirmed that he was Tindell when the officer inquired, providing identification when asked. [Tr. 13]. During this exchange, Headrick's service gun was holstered [Tr. 14]. Long had a holstered sidearm and was also carrying a shotgun. Headrick testified that Long was carrying the shotgun in a "normal carrying position, aimed down at the ground safely." [Tr. 14]. Hughett was armed with his sidearm, which was likewise holstered. [Tr. 14]. Headrick testified that the interaction between the three officers and Tindell and his companion was "very cordial, it was an easy-going conversation with him . . . He stood and talked to me in the middle of the street, answered every question I asked him." [Tr. 15]. Headrick testified that during this initial contact,

he did not consider Tindell detained and that the subject was free to leave. [Tr. 15].

After confirming his identity, Headrick confronted Tindell about the suspected drug activity, asserting that the officers were aware Tindell had been selling OxyContin from his apartment and that he had guns in the apartment, although a convicted felon. [Tr. 15].  Headrick testified that Tindell responded that he was selling OxyContin and that he "didn't deny anything." [Tr. 16].  Tindell then volunteered that a warrant might be out for his arrest. [Tr. 16].  In response, Headrick checked with the National Crime Information Center (NCIC) by way of the KPD Records Department and confirmed that Tindell had an outstanding arrest warrant for shoplifting. [Tr. 16].  During the time it took to get a response from NCIC, other officers arrived on the scene and Headrick continued to talk with Tindell, who continued to make admissions about guns and drugs.  [Tr. 16].  Headrick asked Tindell to sit on the ground while they waited for the NCIC information, which took about three or four minutes.  Headrick testified that as they talked, before he was arrested, Tindell gave the officers consent to search his apartment. [Tr. 17].  After the warrant was confirmed, Headrick arrested Tindell. [Tr. 17].

Headrick testified that after Tindell was arrested on the outstanding shoplifting warrant, Tindell "walked with us to the back of the apartment, which is his front door, and allowed us in his home." [Tr. 17].  Headrick testified that Tindell said, "something along the lines of 'you have got me anyhow, yeah, why not.'" [Tr. 19].  Headrick described Tindell's attitude as "nonchalant...[i]t appeared he felt like he was caught and he knew it." [Tr. 19].  Upon entering the apartment, Headrick and Sergeant Jared Turner ("Turner") conducted a protective sweep of the unit, brought Tindell inside, and directed him to sit at the kitchen table. [Tr. 18].

Headrick testified that after seating Tindell at the kitchen table, the officer advised Tindell

of his Miranda rights. [Tr. 18]. Tindell told Headrick that he could not read or write, and so the officer "thoroughly explained" a written consent to search form to him. [Tr. 18, 57]. Tindell then signed the consent to search form, confirming his earlier verbal consent. [Tr. 18]. Headrick then identified a document as the same written consent to search form with Tindell's signature, dated January 4, 2006, introduced as Exhibit 3. [Tr. 18 - 19]. Headrick testified that Tindell never expressed an unwillingness to allow police to search his apartment. [Tr. 19].

After the consent form was signed, Headrick, Long, Turner, Officer Parks and Officer Blevins searched the apartment. [Tr. 20]. During this search, the officers encountered a locked closet, which Tindell unlocked for them to search. [Tr. 20 - 21]. Inside the closet was a safe, which was standing open. [Tr. 21]. Headrick testified that inside the safe were "guns, handguns, there was OxyContin, cash." [Tr. 21]. Headrick then identified a series of photographs depicting the contraband found by the officers, introduced as collective Exhibit 4. [Tr. 22]. Headrick testified that the police were on the scene of the search about two hours total and seized "about five cruisers of stuff," including power tools suspected to be stolen property. [Tr. 22 - 24]. Headrick's police reports were then introduced as collective Exhibit 5.

Headrick testified that his cruiser was equipped with video and audio recording capability at the time of these events ("cruiser videotape"). [Tr. 26]. Headrick testified that this equipment included a microphone on his person, although transmission from that microphone to the cruiser is affected when obstructed by buildings. [Tr. 26, 58]. The government then played a portion of the cruiser videotape, as identified by the witness. [Tr. 27]. Upon viewing the first minutes of the cruiser videotape, Headrick testified that the recording refreshed his memory that he placed handcuffs on Tindell once the outstanding warrant was confirmed. [Tr. 28]. The cruiser videotape

was introduced as Exhibit 6. Headrick testified that the cruiser videotape confirmed his earlier testimony from memory that Tindell's consent to search the apartment was given *before* he was arrested on the shoplifting warrant. [Tr. 29]. After Headrick proceeded to the apartment door with Tindell, the audio transmission became unintelligible and stopped. [Tr. 29].

### *Cross-Examination*

On cross-examination, Headrick testified that a "knock-and-talk" is a procedure utilized by police to investigate suspected criminal activity at a residence. Ordinarily this would involve an officer walking up to the door, knocking on it and talking to whoever answers the door. [Tr. 31 - 32]. Headrick testified that the three officers originally on the scene were walking toward the door of Tindell's apartment when they first encountered him. [Tr. 33]. Headrick testified that he was unaware whether Tindell had just arrived at the apartment complex himself when first approached by the officers. [Tr. 34]. Headrick testified that he was not sure what kind of vehicle Tindell was driving on that evening, that he did not have information about Tindell's vehicle before he approached the apartment, but that it could have been a pick-up truck or a "sporty car" he observed parked nearby. [Tr. 34].

Headrick stated that he had been in the parking lot no more than five minutes before beginning the approach toward the apartment. [Tr. 35]. Headrick testified that the cruiser videotape had reminded him that about four other police cruisers arrived on the scene during the time he was initially speaking with Tindell. [Tr. 36]. Headrick recalled that Sergeant David Powell also came to the scene while officers were searching the apartment. [Tr. 36]. Headrick confirmed that this totaled some seven police officer who came to the scene during these events. [Tr. 36]. Headrick testified that he believes Tindell's female companion was with him during the entire time of the

initial police interaction outside the apartment. [Tr. 37].

Headrick testified that his earlier traffic stop of the informant, arising from his surveillance of the parking lot on Central Street near Springdale Avenue, would have been recorded on his cruiser videotape. [Tr. 38]. Headrick gave the subject of that stop a misdemeanor citation, but did not arrest him. [Tr. 39]. Headrick said that he had contact with the informant for a period afterwards, but had not spoken to him within a year of the hearing date. [Tr. 40]. Headrick testified that he did not seek a search warrant for Tindell's apartment because he was hoping to secure a consent search. [Tr. 40 - 41].

Headrick testified that he did not know it was Tindell when he first saw the man at the apartment complex, but saw that he matched the description of the subject as the officers walked closer to him. [Tr. 44]. Tindell did not try to run away when he saw the officers, made no threatening movements and, as it turned out, he did not have a weapon on his person. [Tr. 45]. Headrick testified that aside from the initial three officers, the next police officer to arrive on the scene was Turner, whose voice he identified on the cruiser videotape. [Tr. 46]. Headrick testified that his conversation with Tindell began with the officer's assertion that he knew Tindell was selling drugs from the apartment. [Tr. 47]. Headrick described this as "a deception" which he hoped might induce a confession to a crime. [Tr. 47 - 48]. Headrick confirmed that Long was holding the shotgun when they first approached Tindell and these statements were made. [Tr. 48]. Headrick testified that while the officers were waiting for the NCIC report concerning outstanding warrants, he asked Tindell how many guns he had in the apartment, but had not advised Tindell of his Miranda rights. [Tr. 51]. As to whether Tindell was in custody, for purposes of the Fifth Amendment, Headrick testified:

> Mark Tindell was free to leave until my Records Department
> told me on the radio he possibly had an outstanding warrant in
> Knox County.  Up to that point he could have turned around
> at any moment.  There is nothing any of us would have done.
> [Tr. 52]

Headrick testified that during this exchange, while waiting for the report from NCIC, Tindell told the officers he had four guns inside the apartment along with some old OxyContin prescriptions. [Tr. 53 - 54].  While outside in the parking lot area, Headrick did not advise Tindell either that he was free to leave or that he did not have to talk to the officers. [Tr. 54].  Headrick described Tindell as "very passive the whole time." [Tr. 56].

As to the written consent form, Headrick testified that although Tindell could not read the form, the officer "read it word for word to him, line by line, at the end of it I pretty much told him that what he was signing was giving us permission to search his residence in layman's terms.  He understood that.  I wanted him to understand."  [Tr. 58].  Headrick testified that he did not present the consent form to Tindell outside the apartment because they were in the street, and he did not want to embarrass Tindell more than necessary in front of his neighbors. [Tr. 59].

During the search of the apartment, a young white male appeared at the apartment to talk to Tindell.  Other officers got the man's identifying information, although Headrick did not recall his name at the time of the hearing, and the man stayed at the apartment until the search was concluded and the officers left.  [Tr. 60].  Headrick testified that he did not check the apartment lease and that he did not know whether the original informant was, in fact, paying the rent. [Tr. 61].

The defense then played a portion of the cruiser videotape for Headrick, who identified the defendant's voice as saying, "I am not going to tell you 'no, you can't go in my house.'" [Tr. 63]. On another part of the recording, Headrick agreed that Tindell said "something to the effect of 'you

are going to do what you want to do.'" [Tr. 63].  Headrick testified that when the police first arrived

at the apartment complex, he had to telephone the informant to get details about the location of the

apartment. [Tr. 65].  Headrick did not see any criminal activity going on outside the apartment. [Tr.

66].

### B. TESTIMONY OF NEVIN LONG OF THE KNOXVILLE POLICE DEPARTMENT

Knoxville Police Department Investigator Nevin Long ( "Long")  was the second witness

called to testify by the government.  Long testified that in January 2006, he was a patrol officer with

KPD and was involved in the events at issue. [Tr. 73].  Long testified that he was one of the three

initial officers to arrive at the apartment complex on Sanford Road.  Long testified that he did not

speak with Tindell directly, and the only person whom he saw Tindell speaking with was Headrick.

[Tr. 73].  Long testified that he did not see anyone make physical contact with Tindell and no one

threatened Tindell or exhibited threatening behavior toward him. [Tr. 73 - 74].  Long testified that

he carried a shotgun when the three officers made their approach toward the apartment on foot. [Tr.

74].  Long testified that after the initial contact with Tindell, when the officer returned to his cruiser

to get a consent to search form, he was able to return his shotgun to his patrol car. [Tr. 74 - 75, 78].

When asked about Tindell's original verbal consent, Long described:

> Both due to what he was saying verbally and his physical mannerisms,
> he seemed to be giving full consent and being more than cooperative.
> [Tr. 76]

Long described that all nonverbal cues he observed contemporaneous to Tindell's  statement of

consent to search were consistent with compliant consent, rather than concession to a show of force.

[Tr. 77].

Long testified that the door to the apartment was locked, but the keys were on Tindell's person. [Tr. 77]. He also reported that there was no search conducted until after Tindell had signed the consent to search form. [Tr. 78]. Long went to his patrol car to retrieve a consent form "[j]ust for an extra confirmation" of Tindell's consent. [Tr. 79]. The closet where the drugs and guns were found was not locked, but that the safe inside was locked. [Tr. 80]. Headrick asked Tindell about the locked safe and he "willingly come forward and unlocked the safe." [Tr. 81].

Returning to the officers' initial approach to Tindell, Long described further his handling of the shotgun. [Tr. 81]. He said the shotgun was harnessed in a three-point sling in front of him, pointed in a downward direction. [Tr. 81]. He testified that the shotgun was never raised to a ready position and agreed that it was always pointed to the ground. [Tr. 81 - 82].

Long prepared a statement as to these events a few days afterward, which was identified and marked as Exhibit 7. [Tr. 82 - 83]. He read from the statement that "upon confirmation of the outstanding warrant and evidence being discovered, Tindell was advised of his Miranda warnings." [Tr. 83].

### *Voir Dire as to Exhibit 7*

The defense asked for leave to conduct voir dire of the witness as to the proposed exhibit. Long was asked about the date noted on proposed Exhibit 7: March 1, 2006. Long explained that he had prepared a statement about the events closer in time to the January 4, 2006, episode, but was asked to resubmit another, which he then did via e-mail. It was the second statement introduced as Exhibit 7. [Tr. 85]. He was not sure whether he had a copy of his first statement, but said that he would check. [Tr. 85]. At that time, the defense withdrew objection to the admission of Exhibit 7 into evidence, and it was so received. [Tr. 86].

*Cross-Examination*

Upon cross-examination, Long testified that he had been with Headrick near the conclusion of his traffic stop of the informant, but was not privy to the information provided about Tindell. [Tr. 87]. Long confirmed earlier testimony that the officers' first contact with Tindell was as he approached them on foot near the apartment building. [Tr. 88]. As to his decision to bring along the shotgun, Long testified:

> The reason I took the shotgun along is we had from what Officer
> Headrick relayed to me from the traffic stop is the subject had numerous
> firearms and had a propensity for violence and may be willing to use
> those against law enforcement personnel. Because of that intel relayed
> to me, as basically acting as a safety or security officer for the three of us,
> I brought the shotgun.
> [Tr. 89].

After the police met Tindell in the parking lot and "everything was very cordial and there were no problems at that point in time" it became evident the shotgun was not needed. [Tr. 91].

Headrick told Tindell that the police were there as part of a narcotics investigation, specifically because of Tindell's drug sales. Tindell then proceeded to make incriminating statements about drug sales and also told the officers he might have an outstanding warrant for his arrest. [Tr. 96]. While Headrick was in the process of confirming any arrest warrants, Tindell told police he had guns and OxyContin inside his apartment. [Tr. 97]. Inside the apartment, the closet was unlocked, but the safe inside the closet was locked. Long conceded that his testimony on this point was inconsistent with the testimony given by Headrick. [Tr. 97 - 98].

Long testified that his patrol car was equipped with the same recording ability earlier described and identified a copy of his cruiser videotape, introduced as Exhibit 8. [Tr. 100]. Part of the recording was played, and Long identified some of the voices heard and associated sounds with

events described in earlier testimony. [Tr. 102]. Long testified that he was engaged in a different activity and did not hear Headrick administer Miranda warnings to Tindell once inside the apartment. [Tr. 104]. He did remain with Tindell while Headrick and Turner conducted a security sweep of the apartment. [Tr. 105 - 106]. After they returned their attention to Tindell, Long went to his cruiser, secured the shotgun, got a consent to search form and then returned to the apartment. [Tr. 105]. He heard parts of the verbal consent given outside the apartment upon the first exchange with Tindell, and he believed this verbal consent was given before Headrick got a confirmation on the arrest warrant. [Tr. 107]. Long testified that before the warrant confirmation, Tindell was free to leave. [Tr. 107 - 108].

Long testified that the three officers were there to conduct a knock-and-talk investigation into the report of the informant earlier that evening and hoped to ultimately make a narcotics arrest. [Tr. 108, 111].

### C. TESTIMONY OF MELISSA KING

#### *Direct Examination*

The defense called witness Melissa King ("King") to testify as to her recollection of the events. King was with Tindell during the relevant events of January 4, 2006. King recalled the couple were just returning home that evening when they noticed police cruisers in the parking lot of the neighboring apartment complex, estimating between six and twelve cruisers. [Tr. 114]. King and Tindell walked toward their mailbox, evidently located apart from their residence, in part to see what was going on with all the police cars. [Tr. 115]. King testified that the officers then approached them, with guns drawn, describing, "they had big guns with flashlights on the top of them." [Tr. 116]. The officers were shouting commands to stop, to "lay down, get on the ground."

[Tr. 117]. Tindell was "asked a couple of times," but complied with their commands. [Tr. 117]. King testified that she immediately began asking why the police were pointing guns at them, and within a minute or two the officers separated she and Tindell. [Tr. 116]. King testified that the guns were pointed mostly at Tindell, but at herself, too. [Tr. 116].

King testified that she was not in a position to hear Tindell's conversation with the officers after the two were separated, with some exceptions. [Tr. 117]. King testified that she heard Tindell repeatedly asking the officers to allow her to leave, describing:

> Mark kept asking the officers to please allow me to leave over and over again. A couple were okay with it; a couple weren't. Then eventually, I believe, I heard to the fact [sic] that, "if you tell us what we want to know, we'll let her go." Mark agreed, "I'll tell you, I will give you what you want to know, if you let her leave."
> [Tr. 118]

King testified that she did not see Tindell sign a consent to search form, although they were seated next to one another on the couch once they were brought inside the apartment. [Tr. 118]. When asked whether she overheard him give verbal consent to search, King testified, "everything was happening so crazily, I really didn't understand what was going on. I mean, I was completely baffled with the whole situation." [Tr. 119]. King testified that Tindell was allowed to use a cell phone to call a ride for her "probably about 30 or 40 minutes after we were in the house." [Tr. 119]. King testified that when she first saw the officers, she did not feel that she could have turned and walked away, and neither could Tindell. [Tr. 119 - 120].

On cross-examination, King described the particulars of her first sighting of the police cruisers as she and Tindell drove into their apartment complex, reiterating her recollection of three cruisers. [Tr. 122]. King testified that the couple was approached by an estimated 10 police officers in the parking lot area. [Tr. 122 - 123]. King again said that guns with flashlights on them were drawn on the couple, estimating four to six such weapons. [Tr. 125]. King could not say why the audio portion of either cruiser videotape did not record the verbal exchanges she described. [Tr. 125]. King stated that Tindell could have signed a consent to search form after she left the scene. [Tr. 126].

King denied taking any drugs on the date of these events, but admitted using OxyContin during this time period. [Tr. 127]. King testified that she learned she was pregnant sometime in November 2005, and stopped using OxyContin around the beginning of December 2005. [Tr. 128 - 129]. King testified that she was not able to "quit cold turkey," and that was why she continued some use through early December 2005. [Tr. 129]. Before she quit OxyContin, it was her habit to inhale or "snort" the drug after tablets had been crushed to a powder form. [Tr. 130]. King testified that she had no knowledge of any drug use by Tindell on the night of January 4, 2006. [Tr. 130]. King testified that "a couple of years ago" she plead guilty to a theft charge with respect to some jewelry stolen from Tindell, explaining that at that time she had a "drug problem," but later "cleaned up" and moved in with him, living at the apartment at the time of these events. [Tr. 131, 134].

*Re-Direct Examination*

King testified that she did not give consent for the officers to search the apartment on January 4, 2006. [Tr. 135]

*Re-Cross-Examination*

When asked by the government whether she told the officers they could *not* search the apartment that night, King testified that she "didn't know what was going on until they were already in the house and it was happening." [Tr. 136]

## D.  TESTIMONY OF DEFENDANT MARK TINDELL

Tindell elected to testify at the suppression hearing.  Tindell testified that he and King had just returned to the apartment by car, unloaded some things, then went outside to check the mailbox at her suggestion. [Tr. 138].  Tindell recalled six officers were present when they first encountered the police, five were interacting with him and one was "up in the parking lot with Melissa." [Tr. 138].

Describing his initial contact with the officers, Tindell testified that:

> [t]hey asked me if they could ask me some questions and what my name was.  I told them, "yeah," I told them my name.  I told them I probably had an open warrant on me ...
> [Tr. 139]

Tindell testified that he believed the officers were there to take him in on the outstanding arrest warrant. [Tr. 139].  He asked them if he could sit down because he was "freaked out" by the fact the officers had "shotguns and stuff." [Tr. 139 - 140].  Tindell testified that one officer told him the police knew he had been selling drugs, and wanted to know about the drugs. [Tr. 140].  As to the issue of consent to search, Tindell offered this description of the exchange:

Witness.  He asked me if he could ask me some questions. I told him, yes. I can't tell you which officer it was. I don't really remember. I told him, yeah. He went to ask me if I had any guns in my house. First he asked me, he was asking me about Ice and Meth. I told him there was nothing like that in my house, which there was nothing like that in my house. Then they asked me if I was selling OxyContins. If I had guns. I told him I thought there was about six guns in my house. He asked me if he could go in my house. I said I wasn't going to tell him he couldn't go in my house.

Mr. Vogel. Why did you say it that way?

Witness.  I got five officers around me and one in front of me is holding a shotgun. I am not going to, you know, what am I going to do? There wasn't nothing I could do. I wasn't going to tell them they couldn't go in there when they were like all together there was probably eight or nine officers there. [Tr. 141 - 142].

Tindell testified that he had a bad OxyContin habit during this time, more extensive than King was aware. [Tr. 143]. Tindell testified that he does not recall having a conversation with any of the officers about the search, nor does he remember signing any document except a property seizure receipt later that night "at the city jail." [Tr. 143 - 144].

### Cross-Examination

The government asked Tindell to identify a document, later introduced as Exhibit 8, State of Tennessee Notice of Property Seizure and Forfeiture of Conveyances. [Tr. 144]. Tindell testified that he cannot read and could not say what this document was, but identified his own signature upon it. [Tr. 144 - 145]. The government next asked Tindell about Exhibit 3, the consent to search form. [Tr. 146]. As to this form, Tindell testified as follows:

Mr. Stone. Have you ever seen that document before?

Witness. I don't remember it. That is my signature though, yes, it is. I do not remember, like I said, I don't remember what it looked like that night.

Mr. Vogel. What document did you just show him?

> Mr. Stone. Exhibit 3, the Knoxville Police Department consent
> form. He has testified it bears his signature.
> [Tr. 146].

Tindell testified that he was "pretty pilled up" on the night of January 4, 2006, having snorted OxyContin earlier that evening. [Tr. 146]. Tindell estimated that he had snorted six to eight OxyContin that evening, which was more than a typical amount of the drug for him. [Tr. 146]. Tindell testified that while the police did not yell at him, they were treating him "like I was a drug dealer and had to do what he told me to." [Tr. 147]. While the officers did not lay hands on Tindell, he testified that "they didn't assure me they was [sic] not going to though." [Tr. 148]. Tindell repeatedly testified that he saw the shotgun, adding once that the shotgun he saw was pointed at himself. [Tr. 149]. He testified that he never saw any handguns. [Tr. 149].

### Re-Direct Examination

Tindell testified that when five police officers (his recollection) approached him, he did not feel he could have walked away. [Tr. 151].

### Re-Cross-Examination

Tindell testified that he thought the officers were there to arrest him because of the earlier shoplifting charge, but that he had no idea what the officers were thinking. [Tr. 151 - 152]. Tindell described, "they made me feel like that [sic] I couldn't go ... there was five of them there." [Tr. 152].

# II.  ANALYSIS

Tindell contends that the firearms, drugs, cash and paraphernalia, which police seized in his home on January 4, 2006, must be suppressed because they are the fruits of the officers' illegal entry into the home and Tindell's initial illegal detention and interrogation.  In this respect, he argues that the officers did not have consent to search the apartment.  Alternatively, he argues that if the officers did have consent to search, such consent was gained by coercion and intimidation.

The government contends that the evidence was recovered pursuant to a valid consent to search Tindell's apartment, given verbally at first and evinced by a signed consent to search form executed a short time afterward.  The government argues that the officers made no coercive show of force that could be said to have undermined the voluntariness of the consent.

The Fourth Amendment protects citizens against unreasonable searches and seizures.  U.S. Const. amend IV.  A search conducted pursuant to valid consent is an exception to the Fourth Amendment warrant requirement.  Schneckloth v. Bustamonte, 412 U.S. 218 (1973); United States v. Van Shutters, 163 F.3d 331 (1998); United States v. Bueno, 21 F.3d 120, 126 (6th Cir.1994); United States v. French, 974 F.2d 687, 693 (6th Cir.1992); United States v. Clutter, 914 F.2d 775, 777 (6th Cir. 1990); see also Illinois v. Rodriguez, 497 U.S. 177, 181 (1990).

The government has the burden of demonstrating that consent was "freely and voluntarily given," and was not the result of coercion, duress, or submission to a claim of authority.  Bumper v. North Carolina, 391 U.S. 543, 548 (1968); Bueno, 21 F.3d at 126; United States v. Cooke, 915 F.2d 250, 252 (6th Cir.1990).  There is no bright-line rule and even non-verbal consent will suffice as consent in the Sixth Circuit, citing United States v. Taylor and United States v. Whiteside (lifting up a shirt as the equivalent of consent.) The proper analysis for determining the voluntariness of a

detainee's consent is to consider the "totality of the circumstances" of the alleged consent. Schneckloth, 412 U.S. at 227; Bueno, 21 F.3d at 126. It is not necessary that the police inform the detainee that he has a right to refuse consent, but instead, such lack of warning of the detainee's right to refuse will be considered under the totality of circumstances analysis. Schneckloth, 412 U.S. at 227; United States v. Jones, 846 F.2d 358, 360 (6th Cir.1988).

Headrick testified that based upon the tip from the individual stopped earlier that evening that Tindell was selling OxyContin at that location, he and two other officers proceeded to the defendant's apartment to do a "knock and talk." "Federal courts have recognized the 'knock and talk' strategy as a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity." United States v. Jones, 239 F.3d 716, 720 (5th Cir. 2001) (collecting cases); see also Ewolski v. City of Brunswick, 287 F.3d 492, 504-05 (6th Cir. 2002) (citing this passage from Jones with approval). The Court finds that Headrick's suspicions of criminal activity at this apartment were reasonable and he acted in a reasonable manner to investigate the report.

The officers did not get to the apartment door to "knock and talk" in this case, however, because Tindell was found walking across the parking lot area before the officers got to the door. The Court would note that an officer may lawfully approach a person in a public place and ask questions of the individual as long as the person is willing to talk. See United States v. Drayton, 536 U.S. 194, 200 (2002). The Court finds the officers did not act unreasonably in approaching the man who fit the description from the earlier report and asking him questions. The fact that Tindell suspected he had an outstanding warrant for his arrest in a wholly unrelated matter does not transform the officers' actions into an unlawful or coercive detention.

### *Verbal Consent*

The Court finds the testimony of Headrick and Long credible, and concludes that Tindell gave verbal consent to search the apartment while in the parking lot area.  Headrick's testimony on this point was unequivocal and consistent with other evidence regarding the purpose of the officers, Tindell's attitude, and the actions of all persons at the scene in response.  Further, Headrick's account was largely corroborated by Tindell's testimony.  Long retrieved a consent form from his patrol car to memorialize the consent, Tindell either unlocked or otherwise opened the apartment door, Tindell also provided access to the contraband in the closet, and he signed a consent to search form.

The inquiry turns next to the voluntariness of the verbal consent given.  Tindell argues the officers exerted pressure and displayed a show of force that negates his consent, because his consent was not a voluntary choice.  Tindell argues that the purported consent was merely his concession to the authority of the officers, as he believed they were going to search the apartment regardless of what he said.

The Court is cognizant that "[c]itizens do not forfeit their constitutional rights when they are coerced to comply with a request that they would prefer to refuse."  Florida v. Bostick, 501 U.S. 429 (1991).  Likewise, [a]ny 'consent' given in the face of 'colorably lawful coercion' cannot validate" a search.  Lo-Ji Sales, Inc. V. New York, 442 U.S. 319 (1979); accord Ohio v. Robinette, 519 U.S. 33 (1996); Bumper v. North Carolina, 391 U.S. 543 (1968).

The Court finds that the officers did not act in an unduly coercive manner.  They were admittedly at the apartment complex for a purpose contrary to Tindell's penal interest.  Tindell may have been uncomfortable by their presence, either because he had an outstanding warrant or because

their allegations were accurate. Voluntariness does not mean that the consenter was under *no* pressure to consent, however. Although he may have believed the police would search his residence anyway, an effective consent does not require that Tindell knew he had a right to refuse consent to search his apartment. Schneckloth v. Bustamonte, 412 U.S. 218 (1973). Viewing the totality of the circumstances surrounding this interaction, the Court finds that Tindell voluntarily gave his name to the officers, he volunteered the fact that he may have an outstanding arrest warrant, he voluntarily admitted to possession of four guns in his apartment, and he voluntarily consented to a search of his apartment. Moreover, Tindell testified that he was "pretty pilled up" during this event, having snorted six to eight OxyContin that evening. Given that, it is quite reasonable to believe Headrick's testimony that Tindell passively consented to the search and willingly gave incriminating statements to the officers.

### Written Consent

The Court finds that Tindell voluntarily signed a written consent to search form presented to him inside the apartment. Headrick credibly testified to a detailed account of the execution of this form, corroborated in part by Long. Tindell testified that it was his signature affixed to the form, Exhibit 3. Under all of the circumstances, the fact that neither Tindell nor King remembered Tindell's signature on that form is insufficient to rebut the evidence offered by the government that he did sign it voluntarily.

### III: CONCLUSION

Tindell's Motion to Suppress Evidence [Doc. 46], Motion to Suppress Statements [Doc. 47], Second Motion in Limine [Doc. 65], and Motion to Dismiss [Doc. 70] all express a common challenge to evidence anticipated to be introduced by the United States at trial: lack of consent and coercion. Because this Court has found these claims without merit, the Court respectfully **RECOMMENDS** that **[Doc. 46]**; **[Doc. 47]**; **[Doc. 65]**; and **[Doc. 70]** be **DENIED**.[1]

Respectfully submitted,

_____s/ H. Bruce Guyton_____
United States Magistrate Judge

---

[1] Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see also Thomas v. Arn, 474 U.S. 140 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).